IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

ERICA GRIFFIN                                                                                                       PLAINTIFF

v.                                                   CIVIL ACTION NO. 1:23-CV-54-SA-DAS

STARKVILLE OKTIBBEHA COUNTY SCHOOL DISTRICT          DEFENDANT

ORDER AND MEMORANDUM OPINION

Erica Griffin initiated this action on April 7, 2023. Her Amended Complaint [10] brings sexual harassment and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, against the Starkville Oktibbeha County School District ("the District"). Now before the Court is the District's Motion for Summary Judgment [27]. The Motion [27] has been fully briefed and is ripe for review. The Court is prepared to rule.

*Relevant Factual and Procedural Background*

Griffin began working as a bus driver for the District on October 10, 2016. Griffin alleges that by the end of October 2016, her supervisor Kelvin Gibson, Head of the Transportation Department, began sexually harassing her and pressuring her to have sex with him. Griffin alleges that Gibson made frequent comments about her appearance, took pictures of her without her permission, and sent her flirtatious texts and phone calls.

At her deposition, Griffin testified about several specific instances of harassment. First, in September of 2017, Gibson allegedly asked Griffin if she was afraid of him, as she kept backing away from him while he walked towards her. Griffin responded that she was afraid and exited the building. At her deposition, Griffin explained that she was afraid because Gibson was invading her personal space and she was concerned that he would grab her.

Second, Griffin testified that in May of 2018, she asked for the day off for her husband's birthday. Gibson allegedly told her that she could not take the day off unless she went on a date

with him. Griffin testified that she declined the date and took the day off. Griffin further testified that later that year, in September of 2018, Gibson offered to buy her a drink and she declined.

Next, Griffin testified that in September of 2020, Gibson conditioned another employee's health insurance benefits on Griffin's acceptance of his advances. Specifically, Griffin testified that as Gibson was driving from the bus lot one day, her bus monitor, Tiffany Scott, told her to flag Gibson down and ask him about her health insurance. Griffin alleged that she flagged Gibson down and asked him (from the window of the bus) about Scott's insurance. Gibson responded with an apparent proposition that he would give Scott insurance if Griffin accepted his advances. Griffin alleged that she turned to Scott and said, "Well, you'll never have insurance." [27], Ex. 1 at p. 7.

Griffin testified that shortly thereafter, in November of 2020, Gibson asked her why she was covering up and not wearing clothing that showed off her body. Griffin alleged that she ignored him and walked away.

Griffin further testified that in January of 2022, in the presence of another supervisor, Kirby Sherman, Gibson made a comment about her buttocks. Griffin's affidavit more specifically alleges that the comment was: "Guess what? Fake asses have made it Starkville." [31], Ex. 1 at p. 3. Gibson testified that Sherman called her later that day and apologized for the comment on Gibson's behalf. Griffin alleged that during the same month, Gibson hugged her while she was pulling away and telling him to stop.

Griffin testified that in February of 2022, while she was sitting on her bus on the bus lot, Gibson motioned for her to call him. When she called him, he told her that another male teacher asked about her and the two discussed her body. Griffin contends that she angrily responded that she is happily married and to stop talking to her that way.

2

According to Griffin, later in February of 2022, Gibson told her that he gave her the nickname "Traffic Jam" because "[she] ha[s] an ass that can stop traffic." [31], Ex. 1 at p. 3. Griffin asserts that Gibson made this comment in the presence of her co-worker, Melvin Jordan. She contends that she disregarded the statement and walked away.

Griffin testified that she did not report Gibson's sexual harassment to HR because she did not feel it would be helpful. She alleged that she deleted Gibson's texts and tried to stay away from him and do her job.

On February 24, 2022, Gibson terminated Griffin. For context, the Court reverts back to the fall of 2021. That fall, Griffin temporarily stopped working due to a medical issue. She returned in January of 2022. While she was absent, her cousin, Brittany Williams, drove a combined bus route that consisted of her route and Griffin's route. The two routes were apparently adjacent to one another.

When Griffin returned from her medical absence in January of 2022, she began to drive the combined route. She testified that she had no problem driving the combined route. However, Gibson wanted her to drive an additional bus route for the high school, which she did not want to do because she had recently had surgery and was going through a "rough little patch." [27], Ex. 1 at p. 9. Griffin testified that when she told Gibson she would not drive the extra route, he responded, "[I]f you can't drive a route, I don't need you." [27], Ex. 1 at 15. Griffin then asked if she was terminated and if she needed to come back to work, to which Gibson allegedly responded, "No, get the hell off my lot." *Id.* Griffin's affidavit provides that Gibson informed her that she was terminated on February 24, 2022.

Griffin subsequently filed suit in this Court, alleging that she was terminated for rebuffing Gibson's sexual advances—*not* for refusing to drive assigned routes. Griffin testified that she (and

3

other drivers) turned down extra routes on a regular basis because they were optional. Griffin specifically testified that bus driver Melissa Haughton refused to drive Griffin's route after Griffin was terminated, but Haughton was not terminated for her refusal.

For its part, the District denies that Gibson sexually harassed Griffin. In support of its Motion [27], the District submitted an affidavit of Gibson wherein he denies directing any type of inappropriate behavior towards Griffin. *See* [27], Ex. 3. The District additionally submitted affidavits of Scott, Sherman, and Jordan (alleged witnesses to the incidents discussed above) wherein they deny seeing, hearing, or observing Gibson sexually harass Griffin. *See* [27], Ex. 7, 8, 9. The District contends that even accepting Griffin's allegations as true, summary judgment is warranted for other reasons discussed herein.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id*. (quoting *Celotex*, 477 U.S. at 323, 106 S. Ct. 2548). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id*. (quoting *Celotex*, 477 U.S. at 324, 106 S. Ct.

4

2548). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As noted, Griffin brings a retaliation claim and a sexual harassment claim. The Court will address them in turn.

I. Retaliation

Where, as here, a Title VII plaintiff does not present direct evidence of retaliation, the *McDonnell Douglas* burden shifting framework applies. *Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 835 (5th Cir. 2022) (citing *Jones v. Gulf Coast Rest. Grp., Inc.*, 8 F.4th 363, 368 (5th Cir. 2021)). Under that framework, the plaintiff has the initial burden of establishing a prima facie case of retaliation. *Harville v. City of Houston*, 945 F.3d 870, 874 (5th Cir. 2019). "To establish a prima facie case of retaliation, [the plaintiff] must show that: 1) [he] engaged in a protected activity; 2) [he] suffered an adverse employment action; and 3) there is a causal connection between the two." *Owens*, 33 F.4th at 835 (citing *Saketoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 999 (5th Cir. 2022)). "The prima facie case, once established, creates a presumption of discrimination and the burden then shifts to the [employer] to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Harville*, 945 F.3d at 875 (citing *Shackelford v. Deloitte &

*Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999)). If the employer articulates a legitimate, non-discriminatory reason, the burden shifts back to the plaintiff "to 'demonstrate that the employer's proffered reason is a pretext for discrimination.'" *Id.* (citing *Alkhawaldeh v. Dow Chemical Co.*, 851 F.3d 422, 426 (5th Cir. 2017)).

The District contends that Griffin cannot establish a prima facie case of retaliation because she did not engage in a protected activity. "An employee has engaged in an activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996) (quoting 42 U.S.C. § 2000e-3(a)). As noted, Griffin testified that she did not report Gibson's behavior:

> Q. Okay. Didn't show [the text] to HR, didn't show anybody; just deleted it –
>
> A. I'd just delete it.
>
> Q. –and moved on?
>
> A. Yes.
>
> Q. Okay. And how about the calls? Did you report any of the calls to anyone in administration or HR?
>
> A. No.
>
> . . .
>
> Q. Okay. And then it says, No, I didn't go to HR because all they try to do is hide and cover up things. So that's – and that's sort of what you told me. You never reported anything to HR, did you?
>
> A. No.
>
> Q. Or anyone else at the administration?

6

      A.    No.

[27], Ex. 1 at p. 6, 13.

Relying on precedent from the Eighth Circuit Court of Appeals, Griffin contends that her rejection of Gibson's advances constitutes a protected activity. *See* [32] at p. 14 (citing *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1007 (8th Cir. 2000) (holding jury reasonably concluded that plaintiff "oppose[d] discriminatory conduct" where she told her supervisor to stop his offensive conduct)). However, as Griffin additionally points out, the Fifth Circuit has not adopted this approach. In *LeMaire v. Louisiana Department of Transportation and Development*, 480 F.3d 383, 389 (5th Cir. 2007), the Fifth Circuit affirmed the district court's grant of summary judgment where the plaintiff "provid[ed] no authority for the proposition that rejecting sexual advances constitutes a protected activity for purposes of a retaliation claim under Title VII." (citing *Frank v. Harris Cnty.*, 118 F. App'x 799, 804 (5th Cir. 2004) (affirming summary judgment on retaliation claim when only protected activity was "express rejection" of sexual advances)); *see also Giddens v. Comm. Educ. Centers, Inc.*, 540 F. App'x 381, 390 (5th Cir. 2013) (affirming summary judgment for same reason stated in *LeMaire*).

In light of Griffin's testimony that she did not report Gibson's sexual advances, as well as Fifth Circuit precedent indicating that her rejections do not constitute a protected activity, summary judgment is warranted as to Griffin's retaliation claim. That claim is hereby dismissed.

    II.    Sexual Harassment

There are two types of sexual harassment claims: hostile work environment claims and quid pro quo claims. *See Casiano v. AT&T Corp.*, 213 F.3d 278, 283-84 (5th Cir. 2000). Griffin

brings a quid pro quo claim.[1] "To establish a Title VII quid pro quo claim, a plaintiff must show that the acceptance or rejection of a supervisor's alleged sexual harassment resulted in a 'tangible employment action.'" *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 772 (5th Cir. 2009) (citing *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir. 2002)). The Fifth Circuit has defined sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 171 (5th Cir. 2018) (internal alterations and citations omitted). Moreover, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Alaniz*, 591 F.3d at 772 (quoting *La Day*, 302 F.3d at 481-82). "[A] plaintiff must show a 'causal nexus' between the acceptance or rejection of the sexual advances and the tangible employment action." *Id.*

First, accepting Griffin's account as true, she experienced sexual harassment. She testified that Gibson made unwelcome comments about her body, took pictures of her without her consent, hugged her despite her protests, sent her flirtatious texts, and asked her out on dates. Second, the parties agree that Griffin's termination constitutes a tangible employment action.

The primary issue here is causation. The District contends that even accepting her allegations as true, Griffin cannot show a causal nexus between her termination and her rejection of Gibson's advances. The District asserts that Griffin was terminated "solely because she refused

---

[1] The Court notes that the District's Motion [27] originally treated Griffin's claim as a hostile work environment claim and asserted the *Faragher/Ellerth* affirmative defense. In her Response Memorandum [32], Griffin asserts that she suffered a "tangible employment action" and therefore brings a quid pro quo claim for which that affirmative defense is not available. *See Casiano*, 213 F.3d at 283-84 (explaining that where employee has suffered a "tangible employment action," her suit is classified as a quid pro quo case and the affirmative defense is not available). In its Reply [33], the District concedes that Griffin suffered a "tangible employment action" and accordingly analyzes the claim as a quid pro quo claim.

to do the job assigned to her"—namely, drive her assigned bus route. [33] at p. 1. The District contends that Griffin refused to drive the newly-created route that was a combination of her and Williams' route. Though never directly stated, the District also appears to contend that bus drivers are required to drive any "extra" assigned routes. The District asserts that "drivers were regularly expected to drive whatever routes were assigned to them, including covering routes for other drivers who were out and for other reasons." [28] at p. 2. In support, the District points to the bus driver job description, which states that a bus driver is to "maintain routes and schedules as planned by the local school board" and "perform any other duties as assigned by the Director of Transportation." [27], Ex. 4 at p. 1. Further, the termination letter from Gibson to Griffin states: "Ms. Griffin, since you have returned to work, I have given you several assignments in the afternoon and you have refused. . . I will not tolerate any refusals of assignments from you or anyone else. We do not have the right to pick and choose what assignments we want to do and refuse the ones we don't want to do." [27], Ex. 2 at p. 1. Overall, the District's position is that Griffin was terminated for refusing to drive an assigned bus route, which she did not have the option to refuse.

In response, Griffin contends that she was doing what was required of her in the "normal scope of her employment." [32] at p. 10. Griffin testified that she drove the combined route but declined to drive an "extra" high school route, which was optional:

> Q. Okay. All right. And then Mr. Gibson pressured you to drive an additional route. And tell me about that.
>
> A. Well, I had previously spoken to him when I came back to work – that I talked to Mr. Sherman first, and I told him that I would no longer be able to do the extra routes with the junior high and up. And he told me to talk to Mr. Gibson about it, and I said, Okay, I will. I went to his office and I spoke with him about it also. So he was aware that – I did tell him that I would no longer be able to do the extra routes.

9

. . .

Q. Okay. And then during the time you were out, I've seen some note about maybe your cousin drove your route?

A. Yes.

. . .

Q. Uh-huh. What's your cousin's name?

A. Brittany Williams.

Q. And so when you were out, Brittany drove her route, plus your route?

A. Yes, sir.

Q. And then when you came back, they basically said, Okay now you—now that's one route and you're driving the whole thing?

A. Yes, sir.

. . .

Q. . . . I may have seen it my notes somewhere, but there was an issue about you being willing to drive that combined route in the morning but not in the afternoon. Is that –

A. No, sir.

Q. –accurate? Okay.

A. That's inaccurate. Okay. I drive – in the mornings, I do elementary and junior high and Partnership, if you're familiar with Partnership.

Q. I'm not.

A. It's pre-K through 8th grade. . . But it was Armstrong, Partnership, and all the elementary is what I did in the mornings. So I continued to do that in the mornings.

10

>
> And in the afternoon, I never drove high school or junior high. Every once in a while I had to do an extra route picking those kids up, but it was mainly elementary for me in the afternoons. And that's what Brittany's route was as well. Hers was elementary too. . .
>
> Q. And you said sometimes you would have to pick up other routes. Is that because other drives [sic] would be out or –
>
> A. Yes, sir.
>
> Q. Okay. Somebody was on vacation or sick, another driver would be –
>
> A. Or sometimes they might not just wanted [sic] to drive it.
>
> . . .
>
> Q. . . . In that first paragraph in that next to last line, it says extra routes are optional?
>
> A. Yes.
>
> Q. Okay. So you could choose to just say I'm not going to drive an additional route?
>
> A. Yes.
>
> Q. Has that always been the case?
>
> A. Yes.
>
> . . .
>
> Q. Okay. And so when you come back in January of 2022 from being out, did you drive that combined route where it was your route and your cousin's route for a month and then say, I don't want to do it anymore?
>
> A. No. The problem was not with my route and my cousin's route. The route was with the high school that – that he was trying to make me drive that I had previously told him that I wouldn't be able to drive. This – Brittany's route was not the problem. . .
>
> . . .

11

> Q. . . . when you first come back in January 2022, you drove that combined route, your route and your cousin's route, no problems, right?
>
> A. No problems.
>
> Q. And did you – when did Mr. Gibson start saying you have to drive this high school route too?
>
> A. When his – it was one of his – one of my co-workers. From my understanding they were friends or something. He didn't want to drive the route anymore, and so he was trying to make me drive a route.

[27], Ex. 1 at p. 9-10, 13-14.

At summary judgment, the Court must accept Griffin's testimony as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("The evidence of the non-movant is to be believed[.]"). Her testimony indicates that she was driving the newly-created route that she was *required* to drive and that she did not "refuse to do her job" when she turned down an optional extra route.

Griffin additionally testified that on February 24, 2022—the day[2] that Griffin was terminated—bus driver Melanie Haughton was not terminated for refusing to drive an optional route:

> Q. All right. Let me ask you about paragraph 33. February 24, 2022, Mr. Gibson approached Ms. – I don't know how you say that last name, "HAW-ton?" "HOW-ton?"
>
> A. "HAW."
>
> Q. . . . And he pressured Ms. Haughton into driving another route, and she said no. How are you aware of that fact?

---

[2] The Court notes that Griffin's affidavit states that Haughton turned down the additional route on February 25, 2022—the day *after* Griffin was terminated. *See* [31], Ex. 1 at p. 4. In any event, Griffin's position is that Haughton refused the additional route (without ramifications) shortly after she was terminated.

12

    A.    Well, some – I have relatives that still work at the bus shop, and they notified me of the situation because they were trying to understand why I was terminated for saying no. And he asked her to drive my route; and she said no, and she never got terminated.

. . .

    Q.    Okay. All right. And do you know, with respect to Ms. Haughton, if she was asked to drive your route in addition to her route, if she was asked to switch routes? Do you know any of the details of that?

    A.    I have no idea.

. . .

    Q.    . . . I know you told me about Ms. Haughton, and she didn't want to drive your route. Do you believe that was an optional choice she had: She could choose to drive it or not?

    A.    Yes.

*Id.* at p. 8-9, 13.[3]

The District responds with Haughton's affidavit, which states:

> I was never pressured to drive additional bus routes by Kelvin Gibson. I never refused to drive additional bus routes that Kelvin Gibson asked me to drive. The only time I recall telling Kelvin Gibson that I could not drive a particular bus route was when the additional route would have conflicted with another route I was assigned to drive.

[27], Ex. 6 at p. 1-2.

In light of conflicting evidence on the issue, a reasonable juror could find that Haughton was treated differently than Griffin under similar circumstances.

---

[3] Griffin further testified that her father, another bus driver for the District, was the relative that called her and told her that Haughton had refused to drive Griffin's route after Griffin was terminated. [27], Ex. 1 at p. 9.

Lastly, on the issue of causation, the Court finds it noteworthy that several specific incidents of harassment about which Griffin testified occurred in January and February of 2022, shortly before Griffin was terminated on February 24, 2022. Specifically, Griffin testified that Gibson hugged her against her protests in January of 2022. *See id.* at. p. 8. Griffin testified that the phone call where Gibson told her he had been discussing her body with a male teacher occurred in February of 2022. *See id.* And Griffin's affidavit provides that the "traffic jam" comment, which Griffin disregarded and walked away from, occurred in February of 2022. *See* [31], Ex. 1 at p. 3.

Viewing the evidence in the light most favorable to Griffin, a reasonable juror could conclude that Griffin's rejections resulted in her termination. In particular, Griffin has created a question of fact as to the reason for her termination. She testified that she was driving the routes that she was required to drive and that she turned down an optional route. She also testified that Haughton was not terminated for turning down a route almost immediately after she was terminated for doing so, which casts further doubt on the District's explanation for her termination. This evidence, in combination with the evidence that Griffin rejected Gibson shortly before she was terminated, could lead a reasonable juror to believe that Gibson terminated Griffin because she rejected his advances.

*Conclusion*

For the reasons set forth above, the District's Motion for Summary Judgment [27] is GRANTED in part and DENIED in part. Griffin's retaliation claim is dismissed *with prejudice*. She may proceed to trial on her sexual harassment claim.

SO ORDERED, this the 3rd day of September, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE